UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                                   :
UNITED STATES OF AMERICA,                          :
                                                   :
               v.                                  :   NO. 10 CR. 336 (LAK)
                                                   :   ECF Case
CHAD ELIE and                                      :
JOHN CAMPOS,                                       :
                                                   :
                                                   :
               Defendants.                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


# DEFENDANTS' SUPPLEMENTAL SUBMISSION IN SUPPORT
# OF MOTIONS TO DISMISS THE INDICTMENT


| | |
|---|---|
| KRAMER LEVIN NAFTALIS & FRANKEL LLP<br>Barry H. Berke<br>Dani R. James<br>1177 Avenue Of The Americas<br>New York, New York 10036<br>(212) 715-9100 | HAFETZ NECHELES & ROCCO<br>Frederick P. Hafetz<br>Kathleen E. Cassidy<br>500 Fifth Avenue, 29th Floor<br>New York, New York 10110<br>(212) 997-7595 |
| BANCROFT PLLC<br>Paul D. Clement<br>1919 "M" Street, N.W., Suite 470<br>Washington, DC 20036<br>(202) 234-0090 | CLYDE SNOW & SESSIONS<br>Neil A. Kaplan<br>Anneli R. Smith<br>201 South Main Street, Suite: 1300<br>Salt Lake City, UT 84111<br>(801) 322-2516 |
| *Attorneys for Defendant Chad Elie* | *Attorneys for Defendant John Campos* |

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

I.  DOJ'S ANALYSIS OF THE WIRE ACT CONFIRMS THAT IGBA DOES NOT
    APPLY TO POKER ..................................................................................................... 3

    A.  Applying DOJ's Methodology of Interpreting the Wire Act So As Not to
        Render Any Clause Superfluous to IGBA Makes Clear That IGBA's
        Description of the Types of Gambling Covered by the Statute Cannot Be
        Ignored ............................................................................................................. 3

    B.  Applying DOJ's Methodology of Interpreting the Wire Act by Looking to
        the Type of Gambling That Motivated Congress To Act Confirms That
        IGBA Does Not Apply to Poker ....................................................................... 6

II. THE GOVERNMENT'S REVERSAL ON THE WIRE ACT HIGHLIGHTS THE
    VAGUENESS OF IGBA AND UIGEA AND SUPPORTS THE DISMISSAL OF
    THOSE COUNTS ........................................................................................................ 9

CONCLUSION ............................................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Affidavit in Support of Seizure Warrants*, *United States v. All Funds on Deposit at Fifth Third Bank in Account Numbers 7431859508, Held in the Name of Viable Mktg. Corp., et al.,* Case 1:11-cv-02564 (S.D.N.Y. Oct. 26, 2009) .................................................... 1

*Consent Order of Forfeiture*, *United States v. Diskhit*, No. 1:08-cr-01265 (S.D.N.Y. Sept. 21, 2009) .................................................................... 1 n.2

*Criminal Complaint*, *United States v. Schuett*, No. 2:10-mj-01015 (M.D. Fla. Feb. 17, 2010) .................................................................... 1 n.2

*Hill v. Colorado*, 530 U.S. 703, 120 S. Ct. 2480 (2000) ....................................................................................... 9

*Information*, *United States v. Dikshit*, No. 1:08-cr-01265 (S.D.N.Y. Dec. 16, 2008) .................................................................... 1 n.2

*In re MasterCard Int'l Inc.*, 313 F.3d 257 (5th Cir. 2002) ........................................................................................................ 1

*Stipulation & Order of Settlement*, *United States v. $6,637,076.23 in U.S. Currency Funds Previously on Deposit at Goldwater Bank in Scottsdale, AZ, in Account No. 160201, Held in the Name of Allied Wallet, Inc.*, No. 10 Civ. 6169 (S.D.N.Y. Aug. 17, 2010) ....................................................................... 1 n.2

*Superseding Information*, *United States v. Rennick*, No. 1:09-cr-00752 (S.D.N.Y. May 11, 2010) .................................................................... 1 n.2

*United States v. Bass*, 404 U.S. 336, 92 S. Ct. 515 (1971) .............................................................................................. 9

*United States v. Kaczowski*, 114 F. Supp. 2d 143 (W.D.N.Y. 2000) ....................................................................................... 5

*United States v. Manetti*, 323 F. Supp. 683 (D. Del. 1971) ............................................................................................ 1 n.1

*United States v. Vinaithong*, 188 F.3d 520, 1999 WL 561531 (10th Cir. Apr. 9, 1999) ................................................... 1 n.1

*Verified Complaint for Forfeiture In Rem*, *United States v. $289,508.74 in U.S. Funds, More or Less, and All Proceeds Therefrom, Representing All Funds Contained in Suntrust Bank Account Number XXXXXX6205*, Case 2:10-cv-01853 (W.D. Wash. Nov. 15, 2010) ........................................................................................................................ 1 n.2

**STATUTES**

18 U.S.C. § 1084 .................................................................................................................... 4

18 U.S.C. § 1955 ............................................................................................................ *passim*

18 U.S.C. § 1953 (2006)) ............................................................................................... 7-8, 8

**OTHER AUTHORITIES**

116 Cong. Rec. 590 (daily ed. Jan 21, 1970) ...................................................................... 7

116 Cong. Rec. 603 (daily ed. Jan. 21, 1970) ..................................................................... 5

116 Cong. Rec. 35196 (daily ed. Oct. 6, 1970) ................................................................... 7

*Organized Crime Control: Hearing Before the Subcomm. No. 5 of the Comm. on the Judiciary*, 91st Cong. (1970) ........................................................................... 7, 8 n.6

Department of Justice, Office of Legal Counsel , *Whether Proposals by Illinois and New York to Use the Internet and Out-of-State Transaction Processors to Sell Lottery Tickets to In-State Adults Violate the Wire Act* (Sept. 20, 2011), http://www.justice.gov/olc/opinion.htm ..................................................................... 2, 4, 7, 8

For fifty years, the government prosecuted a myriad of gambling activities under the Wire Act, 18 U.S.C. § 1084.[1]  Ignoring the plain language, structure and legislative history of the statute, the government employed an expansive interpretation of the Wire Act to prosecute gambling activities well beyond the sports-related betting the statute was enacted to address. Even after the Fifth Circuit rejected the government's expansive view of the Wire Act, finding that it did not apply to anything other than sports betting, *In re MasterCard Int'l Inc.,* 313 F.3d 257, 262-63 (5th Cir. 2002), the government continued its misguided pursuit of all forms of gambling under the statute.  The government's aggressive deployment of the Wire Act has been particularly prevalent in this District, where it has been used to secure the convictions of, and forfeit millions of dollars belonging to, individuals involved in the business of online poker.[2]  In this very case, the government relied in part on the Wire Act to obtain a warrant to seize bank accounts relating to defendant Chad Elie.  *Affidavit in Support of Seizure Warrants* at 3-4, 18, *United States v. All Funds on Deposit at Fifth Third Bank in Account Numbers 7431859508, Held in the Name of Viable Mktg. Corp.*, *et al.,* Case 1:11-cv-02564 (S.D.N.Y. Oct. 26, 2009)

---

[1] *See, e.g.*, *United States v. Vinaithong*, 188 F.3d 520, 1999 WL 561531, at *1 (10th Cir. Apr. 9, 1999) (unpublished decision) (charging operators of "mirror lottery" with violation of Wire Act); *United States v. Manetti*, 323 F. Supp. 683, 687 (D. Del. 1971) (prosecuting operators of numbers racket engaged in "lottery policy writing").

[2] *See, e.g.*, *Stipulation & Order of Settlement*, *United States v. $6,637,076.23 in U.S. Currency Funds Previously on Deposit at Goldwater Bank in Scottsdale, AZ, in Account No. 160201, Held in the Name of Allied Wallet, Inc.*, No. 10 Civ. 6169 (S.D.N.Y. Aug. 17, 2010) (considering argument by government that defendant funds were subject to forfeiture as proceeds traceable to online poker in violation of the Wire Act); *Superseding Information*, *United States v. Rennick*, No. 1:09-cr-00752 (S.D.N.Y. May 11, 2010) (charging Wire Act violations for payments made related to "poker, blackjack, slot machines, and other casino games"); *Information*, *United States v. Dikshit*, No. 1:08-cr-01265 (S.D.N.Y. Dec. 16, 2008) (charging Wire Act violation for operation of an internet business offering casino and poker games); *Consent Order of Forfeiture*, *United States v. Diskhit*, No. 1:08-cr-01265 (S.D.N.Y. September. 21, 2009) (obtaining defendant's guilty plea to Wire Act charges for offering online casino and poker games, with forfeiture of $300 million); *Verified Complaint for Forfeiture In Rem*, *United States v. $289,508.74 in U.S. Funds, More or Less, and All Proceeds Therefrom, Representing All Funds Contained in Suntrust Bank Account Number XXXXXX6205*, Case 2:10-cv-01853 (W.D. Wash. Nov. 15, 2010) (alleging violation of Wire Act in forfeiture action against bank accounts containing online poker funds); *Criminal Complaint*, *United States v. Schuett*, No. 2:10-mj-01015 (M.D. Fla. Feb. 17, 2010) (seeking search warrant to find evidence of Wire Act violations stemming from payment processing for online poker companies).

(referencing Wire Act as support for application to seize funds allegedly derived from operation of online poker businesses).

On September 20, 2011, the Office of Legal Counsel ("OLC"), which is charged with providing legal advice to the Department of Justice ("DOJ") and whose determinations are binding on the agency, *see* Department of Justice, Office of Legal Counsel, *available at* www.justice.gov/olc, issued an opinion rejecting the government's sweeping view of the Wire Act's scope.  The OLC concluded that the Criminal Division's long-argued interpretation of the Wire Act as covering nearly all forms of "bets and wagers," as opposed to sports-related bets and wagers only, was inconsistent with the statute's text, purpose and canons governing the construction of criminal statutes.  Department of Justice Office of Legal Counsel, *Whether Proposals by Illinois and New York to Use the Internet and Out-of-State Transaction Processors to Sell Lottery Tickets to In-State Adults Violate the Wire Act* (Sept. 20, 2011) ("OLC Mem."). The OLC'S rejection of "the Criminal Division's premise" that the Wire Act must apply to all forms of alleged gambling, OLC Memo at 2-3, provides powerful support for this Court to also reject the Criminal Division's similar premise that 18 U.S.C. § 1955 ("IGBA") must apply to all forms of alleged gambling, including online peer-to-peer poker.

This supplemental brief requested by the Court addresses the specifics of the OLC's analysis of the Wire Act.  That analysis confirms that the Criminal Division is (once again) stretching the federal gambling statutes beyond their proper reach in arguing that IGBA applies to the conduct at issue in this case.  In addition, DOJ's reversal of the Criminal Division's long-held interpretation of the Wire Act—that served as the basis for countless convictions and forfeitures—underscores that under the rule of lenity, the Criminal Division's use of UIGEA and IGBA in this case should be rejected.  Indeed, were these statutes read to prohibit on-line poker,

2

they would fail to provide the required notice of what the law forbids and the necessary guidance to those who enforce the law.

## I. DOJ'S ANALYSIS OF THE WIRE ACT CONFIRMS THAT IGBA DOES NOT APPLY TO POKER

Despite the repudiation of its argument that the Wire Act criminalizes all types of gambling involving the use of the wires, the government continues to press the same argument with respect to IGBA. Even though IGBA, like the Wire Act, defines the particular types of gambling games that fall within its ambit, the government attempts to expand that definition to include poker. DOJ's analysis of the Wire Act highlights the flaws in the government's construction of IGBA, which is supported by neither the text nor the legislative history of the statute, and supports dismissal in this case.

### A. Applying DOJ's Methodology of Interpreting the Wire Act So As Not to Render Any Clause Superfluous to IGBA Makes Clear That IGBA's Description of the Types of Gambling Covered by the Statute Cannot Be Ignored

The government contends that poker is covered by IGBA because "poker has, throughout history, been understood to be a kind of gambling." (Gov't Opp. Br., 14[3]). According to the government, so long as poker constitutes a violation of state law, it may be prosecuted under the statute. (*Id.* at 12). The government's position, which ignores the statutory language describing the types of gambling to which IGBA was intended to apply, is directly at odds with DOJ's definitive analysis of the Wire Act, which binds the federal government here.

In examining the Wire Act,[4] DOJ was called upon to determine whether the phrase "bets and wagers" referred to all possible bets or wagers, or just those relating to sporting events or

---

[3] Submitted on November 4, 2011 in response to Defendants' Pre-Trial Motions (ECF No. 89) (hereinafter "Gov't Br.")
[4] The Wire Act provides, in relevant part:

3

contests. While recognizing that the Wire Act could be read "either way," (OLC Mem. 5), DOJ rejected the Criminal Division's expansive construction in favor of a more narrow reading of the statute that makes sense of the Act's provisions as a whole and gives independent meaning to each portion of its text. *See* OLC Mem. 4 n.5 (rejecting Criminal Division's interpretation of the second part of the statute as two separate prohibitions which would have resulted in needless redundancy and therefore violated the "rule against superfluities") (citing *Hibbs v. Winn,* 542 U.S. 88, 101 (2004)); *id.* at 5 (determining that the phrase "on any sporting event or contest" in the first clause modifies both "the transmission in interstate or foreign commerce of bets and wagers" and "information assisting in the placing of bets or wagers" to ensure that the prohibitions are parallel in scope).

Applying that same analysis to IGBA, it is clear that the government's attempt to bypass the statute's definition of gambling in favor of some purportedly common understanding of the term must be rejected in this case. IGBA provides:

> (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.
>
> (b) as used in this section –
>
> (1) "illegal gambling business" means a gambling business which
>
> (i) is a violation of the law of a State or political subdivision in which it is conducted;

---

> Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1084(a).

4

> (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
>
> (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
>
> (2) "gambling" includes but is not limited to pool selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

18 U.S.C. § 1955. In order to give meaning to each of the statute's provisions, subsection (b)(2) must be understood as defining the particular types of activities that constitute gambling under the statute, which, if carried on by a "business" operating in the manner set forth in subsection (b)(1)(i)-(iii), are rendered unlawful under the statute. *See United States v. Kaczowski,* 114 F. Supp. 2d 143, 152 (W.D.N.Y. 2000) (identifying definition of conduct as "gambling" as a separate element from illegality under state law); *see also* 116 Cong. Rec. 603 (daily ed. Jan. 21, 1970) (statement of Sen. Allott) ("The statute defines an 'illegal gambling business' as one including such forms of betting as bookmaking or numbers *and* which first, is a violation of State law; second, involves five or more persons . . . .") (emphasis added). Unless poker falls within the categories of games delineated in subsection (b)(2), the fact that it violates state law is simply irrelevant under the statute.

Ignoring the interplay of the subdivisions, the government contends that what constitutes an "illegal gambling business" under IGBA is determined by reference to state law. (Gov't Br. 12). According to the government, the meaning of the word "gambling" in the phrase "gambling business" in subsection (b)(1) is not determined by the text of subsection (b)(2) but rather by reference to history, popular culture, or some freeform common understanding of the term. (*Id.* at 14-15). Were that the case, however, there would have been no need for Congress to include

5

the list of enumerated activities in (b)(2). Just as DOJ rejected the Criminal Division's expansive reading of the Wire Act to avoid rendering any portion of the Wire Act superfluous, this Court should reject the government's interpretation of IGBA to avoid rendering the description of the encompassed gambling activities in subsection (b)(2) superfluous.

> **B.    Applying DOJ's Methodology of Interpreting the Wire Act by Looking to the Type of Gambling That Motivated Congress To Act Confirms That IGBA Does Not Apply to Poker**

As demonstrated by defendants in their motions to dismiss, poker does not fall within the confines of IGBA. (Elie's Mot. to Dismiss Counts 5-7, 9, at 10-13; Campos' Mot. to Dismiss, at 16-19[5]). While the list of games enumerated in subsection (b)(2) is illustrative and not exhaustive, poker bears no resemblance to the house-banked and lottery-type games and sports betting expressly targeted by the statute. But to the extent there is any ambiguity with respect to the types of gambling IGBA prohibits, DOJ's analysis of the Wire Act demonstrates how that ambiguity should be resolved in favor of the defendants and further supports dismissal in this case.

In determining that the Wire Act does not apply to bets or wagers unrelated to sporting events, DOJ viewed the Act's legislative history as a critical factor. Citing the House Judiciary Committee Report, among other sources, DOJ observed that Congress's "overriding goal in the Act was to stop the use of wire communications for sports gambling in particular. Congress was principally focused on off-track betting on horse races, but also expressed concern about other sports-related events or contests, such as baseball, basketball, football, and boxing." (OLC Mem. at 8-9).

---

[5] Elie submitted his Memorandum of Law in Support of his Motion to Dismiss Counts 5-7, 9 on September 30, 2011 (ECF No. 79-1) (hereinafter "Elie's IGBA Br."). Elie also submitted his Memorandum of Law in Support of his Motion to Dismiss Counts 1-4 on September 30, 2011 (ECF No. 78-1) (hereinafter "Elie's UIGEA Br."). Campos submitted his Memorandum of Law in Support of His Motion to Dismiss on September 30, 2011 (ECF No. 76) (hereinafter "Campos' Br.").

Nothing in the legislative history of IGBA suggests that Congress sought to regulate anything other than the types of house-banked games of chance, lotteries and sports betting enumerated in the statute.  The overriding purpose of IGBA was unquestionably to combat organized crime.  *E.g.,* 116 Cong. Rec. 35196 (daily ed. Oct. 6, 1970) (statement of Sen. Celler) ("the purpose of S.30 as amended is to curb organized crime…."); *Organized Crime Control: Hearing Before the Subcomm. No. 5 of the Comm. on the Judiciary*, 91st Cong. 287 (1970) [hereinafter *House Hearings*] (Statement of Rep. Halpern) ("this bill would go far toward curbing the flow of funds into the coffers of organized crime….").  The sponsor of the bill observed that numbers rackets, bets on horse racing and sporting events, lotteries, dice games, and illegal casinos were the most important forms of syndicated gambling.  *See* 116 Cong. Rec. 590 (daily ed. Jan. 21, 1970) (statement of Sen. McClellan).  In passing the statute, the focus was on "[t]he directors and managers of the major numbers, booking, and sports gambling operations," who were "the same Mafia leaders who engage in extortion, labor racketeering, corruption of legitimate business, and the panoply of other illegitimate enterprises which support organized crime."  *House Hearings* at 105 (1970) (Statement of Sen. McClellan).  There is simply no basis in the legislative record to conclude that poker falls within this category of games—those which served as the lifeblood of organized crime—proscribed by IGBA.

In fact, as DOJ's analysis of the Wire Act demonstrates, that Congress did not include poker or any other peer-to-peer game in subsection (b)(2), despite its obvious awareness of such games, counsels against the government's expansive reading of the statute as including those games.  In determining the scope of the "bets and wagers" prohibited by the Wire Act, DOJ found it particularly significant that the Transportation of Wagering and Paraphernalia Act, Pub. L. No. 87-218, 75 Stat. 492 (1961) (codified at 18 U.S.C. § 1953 (2006)), passed the same day

7

the Wire Act was enacted, specifically prohibits the transportation of materials used in bookmaking, sporting pools and lottery games. (OLC Mem. 11). The fact that the Wire Act only makes specific mention of sporting events and contests and not lottery games persuaded DOJ that "Congress did not intend to reach non-sports wagering in the Wire Act." *Id.*

DOJ's rejection of the Criminal Division's unbridled reading of the phrase "bets and wagers" in the Wire Act underscores that when passing legislation addressing gambling, Congress does not rely on history or popular music or common conceptions of a word or phrase to define the reach of federal statutes as the government seems to contend. Instead, Congress describes with particularity the types of games it intends to regulate. And just as the Wire Act refers to sports betting, and the Wage and Paraphernalia Act refers to bookmaking, sports-wagering pools, and various lottery games, IGBA refers only to house-banked games, lotteries and sports betting as falling within its scope. The government's attempt to deploy a broad reading of "gambling" under IGBA, untethered to the statute's text and history and the overall federal legislative landscape, should be similarly rejected by this Court.[6]

---

[6] The same analysis demonstrates that IGBA does not apply to foreign businesses like the poker companies. IGBA applies only to businesses "conducted" in a "state or political subdivision," while the Wire Act and Paraphernalia Act apply expressly to foreign commerce. Just as the contrast between the text of the Wire Act and the Paraphernalia Act shows that Congress did not intend the former to apply to wagers that are not sports-related, the contrast between IGBA and other federal gambling statutes demonstrates Congress's intent to limit IGBA to domestic businesses. Moreover, just as the Wire Act's legislative history confirmed its focus on sports betting (as opposed to gambling generally), IGBA's legislative history confirms it was directed at wholly intrastate gambling businesses that had escaped traditional efforts to regulate interstate commerce (as opposed to efforts to reach extraterritorial conduct). *See Measures Relating to Organized Crime: Hearings Before the Subcomm. on Crim. Laws & Procedures of the S. Comm. on the Judiciary*, 91st Cong. 382-83 (1969) (Statement of Will Wilson, Asst. Att'y Gen.) (explaining that, in contrast with other statutes, IGBA covers intrastate syndicated gambling); *id.* at 425 (statement of William Hundley, former head of the Racketeering and Organized Crime Section at the Department of Justice) (noting that the "only area where [IGBA] would be helpful" would be combating large-scale intrastate numbers rackets); *see also* Elie's IGBA Br. 14-17; Campos' Br. 19-23.

## II. THE GOVERNMENT'S REVERSAL ON THE WIRE ACT HIGHLIGHTS THE VAGUENESS OF IGBA AND UIGEA AND SUPPORTS THE DISMISSAL OF THOSE COUNTS

The tangled history of the Wire Act is a cautionary tale that demonstrates the danger of applying IGBA and UIGEA to the facts of this case. For decades, DOJ enforced the Wire Act against people it now concedes had not violated it. The Wire Act was so vague and ambiguous that even those charged with enforcing it were not able to determine its meaning with certainty for more than half a century. *See Hill v. Colorado*, 530 U.S. 703, 732, 120 S. Ct. 2480, 2498 (2000).

That same problem exists with respect to IGBA and UIGEA and warrants dismissal in this case. As defendants have explained in their briefs, poker is widely understood to be qualitatively different from the games enumerated in IGBA, and from games of chance regulated by UIGEA. This is so not only because poker is not house-banked, but also because poker involves a degree of skill that dwarfs that in games traditionally understood as gambling. (Elie's UIGEA Br., 19-21; Elie's IGBA Br., 32-34; Campos' Br., 31-32). The rule of lenity, which "embodies the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should," *United States v. Bass,* 404 U.S. 336, 348, 92 S. Ct. 515, 523 (1971), calls for a construction of both statutes that puts poker beyond their reach. Indeed, were these statutes read to prohibit online poker, they would be void for vagueness for failing to provide the requisite notice of what the law forbids and required guidance to those who enforce the law. (Elie's UIGEA Br., 14-19; Elie's IGBA Br., 25-32; Campos' Br., 23-32).

Although the government dismisses these concerns and argues that an as-applied vagueness challenge is inappropriate in this case because IGBA has historically been applied to poker, and because in the government's view, there is "no doubt" that poker is a "game subject

9

to chance" under the UIGEA, (Gov't Br. 25, 46), the government's conclusory assertions are unpersuasive.  Just a short time ago, the government was equally adamant that the Wire Act applied to poker, and DOJ's belated recognition that the Criminal Division had wrongly urged an expansive definition of the Wire Act and even persuaded some members of the Judiciary to accept that flawed interpretation shows that the government's past conduct with regard to IGBA should be afforded little if any weight.  In fact, the government's demonstrated proclivity for applying a vague and ambiguous gambling statute to reach conduct Congress never sought to proscribe severely undermines the credibility of its position with regard to the gambling statutes at issue in this case.[7]

## CONCLUSION

For the foregoing reasons, and for those more fully set forth in defendants' earlier memoranda, Chad Elie and John Campos respectfully request that the Court dismiss all counts of the Indictment against them.

---

[7] In order to further demonstrate that DOJ's rejection of the Criminal Division's expansive interpretation of the Wire Act fully supports the defendants' position in this case, the defendants requested that the Criminal Division produce copies of its submissions to OLC that are referenced in OLC's opinion.  The government refused to produce the submissions, asserting that they are "work product."

Dated: February 6, 2012
       New York, New York

Respectfully Submitted,

| KRAMER LEVIN NAFTALIS & FRANKEL LLP | HAFETZ NECHELES & ROCCO |
|---|---|
| By:_____/s/_____<br>    Barry. H. Berke<br>    Dani R. James | By:_____/s/_____<br>    Frederick P. Hafetz<br>    Kathleen E. Cassidy |
| 1177 Avenue of the Americas<br>New York, New York 10036<br>(212) 715-9100 | 500 Fifth Avenue<br>New York, New York 10110<br>(212) 997-7595 |
| BANCROFT PLLC | CLYDE SNOW & SESSIONS |
| By:  Paul D. Clement | By:  Neil A. Kaplan<br>      Anneli R. Smith |
| 1919 "M" Street, N.W., Suite 470<br>Washington, DC 20036<br>(202) 234-0090 | 201 South Main Street, Suite: 1300<br>Salt Lake City, UT 84111<br>(801) 322-2516 |
| *Attorneys for Defendant Chad Elie* | *Attorneys for Defendant John Campos* |