UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -  x

UNITED STATES OF AMERICA              :

    -v.-                              :
                            S3 10 Cr. 336 (LAK)
CHAD ELIE and                         :
JOHN CAMPOS,
                            :
        Defendants.

- - - - - - - - - - - - - - - -  x


## GOVERNMENT'S OPPOSITION TO DEFENDANT CHAD ELIE'S MOTION *IN LIMINE* TO PRECLUDE EVIDENCE RELATING TO ALLEGED THEFT AND PARTYGAMING

PREET BHARARA
United States Attorney for the
Southern District of New York
*Attorney for the United States
    of America*


Arlo Devlin-Brown
Andrew D. Goldstein
Assistant United States Attorneys
    - *Of Counsel* -

i

## TABLE OF CONTENTS

I.   Evidence Relating To Elie's Theft From Pokerstars Should Not
     Be Precluded.. . . . . . . . . . . . . . . . . . . . . . 1

     A.   Relevant Facts. . . . . . . . . . . . . . . . . . . 1

     B.   Discussion . . . . . . . . . . . . . . . . . . . . 3

II.  Evidence Relating To Partygaming's Departure From The United
     States Should Not Be Precluded  . . . . . . . . . . . . 7

     A.   Relevant Facts. . . . . . . . . . . . . . . . . . . 8

     B.   Discussion . . . . . . . . . . . . . . . . . . . . 9

**GOVERNMENT'S OPPOSITION TO DEFENDANT CHAD ELIE'S MOTION *IN LIMINE*
TO PRECLUDE EVIDENCE RELATING TO ALLEGED THEFT AND PARTYGAMING**

Defendant Chad Elie's motion *in limine* to preclude evidence
relating to Elie's theft of $4 million belonging to Pokerstars
from the National Bank of California and evidence relating to the
withdrawal of Parytgaming from the United States should be
denied.  Evidence relating to Elie's theft of Pokerstars funds
should be admitted because it is direct evidence of the charged
offenses and explains the relationship between co-conspirators.
Evidence relating to Partygaming's departure from the United
States – while expected to be highly limited – is also
appropriately admitted.

**I.   Evidence Relating to Elie's Theft From Pokerstars Should Not
       Be Precluded**

**A.   Relevant Facts**

The facts concerning Elie's theft from Pokerstars are set
forth in greater detail in the Government's Motion *In Limine* of
March 12, 2012 (docket entry 154)which sought a ruling as to the
admissibility of this and other evidence. In summary, in the fall
of 2008, the poker processor Elie had been working for – the
Australian company Intabill – began its collapse.  The banks
Intabill and its associates had tricked into processing internet
poker transactions were shutting down the processing accounts,
and those who worked with Intabill on the gambling transactions
were mired in internal squabbling. Elie was very much a part of

1

this collapse: a Pokerstars processing account at the National Bank of California that Elie had represented to be a processing "payday loans" was shut down in October 2008 when the National Bank of California learned that the transactions did not appear to be for payday loans had been represented.  At the time the National Bank of California shut down the processing, the account held over $4 million that had been withdrawn from Pokerstars customers, and which Intabill was required to remit to Pokerstars.

Elie, though, arranged to take the money for himself.  He contacted the bank and directed the bank to remove the other signers on the bank account, leaving Elie in sole control.  Elie then simply transferred money from the National Bank of California to his own bank accounts.  Elie started by taking $1.5 million in November 2008.  As Intabill's situation worsened, Elie took $500,000 more in February 2008 and $1.5 million more in March 2008.

Elie refused to return the money despite repeated requests, first from Intabill and then from Pokerstars directly.  Indeed, when Pokerstars ultimately sued Elie (through a lawsuit brought not under its own name but under the name of Intabill), Elie alluded darkly in his motion to dismiss that the real plaintiff was hiding behind Intabill.  The dispute was settled only when Elie and the head of Pokerstars, Isai Scheinberg (a co-

defendant), met personally, with Scheinberg allowing Elie to keep some of the money in return for finding new processing relationships for Pokerstars.  Indeed, it was through this reconciliation process that Elie introduced Pokerstars to Sunfirst Bank.

###   B.   Discussion

The Government's March 12, 2012 *in limine* motion addressed in detail why the evidence regarding the theft from Pokerstars is relevant.  For one thing, the theft is simply part of the story of the crime on trial (indeed, it is specifically addressed in the Indictment).  Elie moved money for Pokerstars from 2008 though 2010, and the spat in the middle of this relationship and how it was resolved is at the foundation of offense narrative. For another thing, the theft speaks volumes as to Elie's motives, knowledge and intent – a critical issue given that Elie is charged with the specific intent crime of conspiracy to commit bank and wire fraud.  The theft evidence shows Elie had no qualms about lying to banks in connection with poker processing.  Elie lied to establish the processing relationship with National Bank of California (claiming the money was for payday loans) and then after he was caught lied again by telling the bank that the money in the account belonged to him (Elie told the bank to remove two other individuals from the account who worked with Intabill). Elie's refusal to return the money notwithstanding threats (which

3

Elie commented he could not report to the police given the
"nature" of the business) and appeals to reason is also evidence
both that Elie knew he was processing gambling transactions (i.e.
Pokerstars, not some other merchant, confronted him to claim the
funds) and that he knew the gambling business was not legitimate.
Indeed, Elie's ability to settle the lawsuit in a way that let
him keep half of the money (which, indisputably, Pokerstars was
owed) and continue as a processor for Pokerstars is powerful
evidence both of Pokerstars' desperation to find processors to
handle its illegal business and of Elie's savvy exploitation of
his leverage in a case where an illegal gambling company had
brought suit in federal court while seeking to keep its true
identity disguised.

The objections to this evidence set forth in Elie's motion
do not address the core relevance of this evidence to the case.
First, Elie cites a number of cases, including this Court's
decision in *United States v. Benussi*, 216 F. Supp 2d 299 (S.D.N.Y
2002), for the broad proposition that the one co-conspirator's
theft from another will only rarely be an overt an act in
furtherance of the conspiracy. *Id.* at 314 (concluding dispute
between conspirators on dividing spoils was not an act in
furtherance of the conspiracy extending the length of the
conspiracy for statute of limitations purposes). But the
Government is allowed (indeed, is required) to prove more than

4

overt acts in furtherance of the conspiracy – it must prove each and every element of each charged offense, including knowledge and intent elements, and the underlying existence of an agreement, among others.  Neither *Benussi* nor any other cases cited by defendants remotely suggests that evidence of theft among criminal is inadmissible or irrelevant, only that it will not usually suffice as an overt act.

Second, relying on Rule 403 and selectively quoting from the Government's prior briefing, Elie inaccurately claims that the "government contends . . . the episode reveals some aspect of Mr. Elie's character that enable him to engage in conduct designed to deceive the banks." (Def Mem. At 13).  In fact the Government's argument at trial will not be based on *Elie's* character at all; it will be based on the nature of the nature of the co-conspirators "business."  The Government will be required to prove that the underlying businesses at issue were illegal, and, to meet the specific intent requirement of the bank fraud and wire fraud statutes, will have to prove that Elie knew he could not reveal the true nature of the business to banks.[1]  Evidence that processors (including but no means limited to Elie – evidence will show it to be endemic) felt absolutely no qualms about taking whatever they pleased from the Poker Companies and

---

[1]   Indeed defendants have argued, in pending motions, that the Government must also prove that Elie knew poker was illegal gambling in connection with the charged gambling offenses.

evidence that the Poker Companies had little choice but continue to work with those who wronged them is powerful evidence of what this business was, and what those involved knew it to be.  In short, jurors will see behavior by Elie and others more consistent with an illegal venture such as narcotics distribution than any legitimate business activity where processors are a dime a dozen and the business would not consider hiring (as Pokerstars did Elie) the person who had just stolen $4 million from it.

Third, Elie claims that introduction of this evidence would "unduly prolong the trial."  It would do nothing of the sort.  The Government's principal witnesses as to the theft (co-conspirators of Elie and bank officials) are all witnesses who will be testifying for the Government in any event, precisely because the evidence is so inextricably intertwined with the evidence of Elie's processing relationship with Pokerstars.  The suggestion that this evidence of theft would necessitate a time-consuming defense involving the presentation of a "fulsome picture of the complex web of financial relationships" is also dubious.  Even assuming that Elie made a strategic decision to devote further attention to the issue, evidence that Elie may have been owed money by people who worked with Intabill cannot justify Elie's decision to simply take what he thought he was owed from funds that had just been deposited by customer of Pokerstars to be credited to their Pokerstars accounts.

Finally, there would be a fundamental unfairness to preclude this evidence given that the defense no doubt intends to offer evidence (at minimum, through cross-examination of Government witnesses) that Intabill's founder, Daniel Tzvetkoff, who processed over $1 billion for the Poker Companies, ended up owing tens of millions to Pokerstars.  While Tzvetkoff's lifestyle is squarely responsible for much of the missing money ($25 million on a house, for example), the fact is that "sub-processors" that Tzvetkoff relied on – including Elie – also failed to remit and indeed simply made off with the money Pokerstars was missing. Indeed it is this fact – that virtually everyone in the processing business, from Tzvetkoff through his sub-processors – took more from the Poker Companies than was due speaks volumes about the illegal nature of the underlying business, and the knowledge of its participants, including Elie, as they lied to banks to disguise it.

## II.  Evidence Relating to Partygaming's Departure From The United States Should Not Be Precluded

Elie argues that evidence relating to Partygaming's departure from the United States after the passage of the UIGEA should be precluded as unduly prejudicial.  While the Government in fact has no plans to introduce independent evidence of Partygaming's decision to leave the United States, there may be a limited role for witness testimony on this subject.

Specifically, witnesses should be permitted to testify about Partygaming's departure from the United States to the extent that (1) the witness communicated about this matter with Chad Elie or (2) to the extent that a given witness's state of mind as to the legality of gambling is deemed relevant and the departure of Partygaming has bearing on the witness's state of mind.

### A. Relevant Facts

Prior to the enactment of the Unlawful Internet Gambling Enforcement Act ("UIGEA"), Partygaming (which traded on the London Stock Exchange) was the dominant internet poker room, in the United States and worldwide.  On the day the UIGEA was enacted, and in response to the law, Partygaming stopped offering gambling to United States customers, sending shockwaves through the internet poker industry.  In December, 2008, one of Partygaming's founders, Anurag Dikshit, pled guilty in this district pursuant to a cooperation agreement, and agreed to forfeit $300 million.  On April 6, 2009 Partygaming entered into a non-prosecution agreement with the this Office in which the company admitted that its gambling operation had violated the Illegal Gambling Business Act ("IGBA," 18 U.S.C. § 1955) and that its payment processing methods (which involved disguising the gambling transactions) violated the mail and wire fraud statutes. Each of these events was publicized in both mainstream media and in gambling industry press, blogs, and online forums.  Many

involved in the industry discussed these events, and the implications it had for the three companies, Pokerstars, Full Tilt Poker, and Absolute Poker/Ultimate Bet, that had risen to fill the void Partygaming's departure had left.

**B. Discussion**

In the trial against Elie and Campos in particular, Partygaming's departure from the United States market and related fallout has limited significance. The Government does not plan to offer independent evidence of Partygaming's departure from the United States, such as evidence of Court proceedings or testimony from Partygaming employees. The Government does not disagree with defendant's claim that the simple fact of Partygaming's departure is of no independent evidentiary relevance on the issue of whether internet poker is in fact illegal.

What may be relevant, however, is what Elie knew of Partygaming's departure from the United States, the guilty plea of Dikshit in December 2008, and Partygaming's non-prosecution agreement in April 2009. Given that the Government must prove Elie's specific intent to commit band and wire fraud, his awareness, if any, of these events is highly probative. That a defendant would choose to engage in a course of conduct – use misleading means to disguise poker transactions – that the world's largest poker company (and one of its founders) had acknowledged as fraudulent speaks volumes as to knowledge and

9

intent to commit fraud.  Nor would such prejudice be "unfair" because the evidence would be limited to communications made to Elie about Partygaming's situation, thus insuring jurors would not deem Elie to have knowledge of events surrounding Partygaming's departure simply because those events occurred.

Finally, although it is difficult to identify a particular scenario in the abstract, there may be situations in the course of trial (depending, in part, on the Court's resolution of in limine motions re the intent requirements under the gambling statutes) where a witness's own knowledge of Partygaming's departure is relevant to that witness's own intent.  For example, in the event that a witness (whether Government or defense) was permitted to testify about his/her own views as the legality or risk associated with poker processing, the parties should be allowed to examine the witness as to whether the witness was aware of the Partygaming withdrawal and ensuing court proceedings and the extent to which this impacted the witness's thinking or conduct.

## <u>CONCLUSION</u>

For the reasons set forth above, the Government respectfully submits defendants motions should be denied.


Dated:      New York, New York
            March 19, 2012

                         Respectfully submitted,

                         PREET BHARARA
                         United States Attorney


                   By:  <u>/s/ Arlo Devlin-Brown</u>
                         Arlo Devlin-Brown
                         Andrew D. Goldstein
                         Assistant United States Attorneys
                         Tel. (212) 637-2506/1559

11

**Certificate of Service**                    **Filed Electronically**

---

The undersigned attorney, duly admitted to practice before this Court, hereby certifies that on the below date, he served or caused to be served the following document in the manner indicated:

**Government's Motions in Limine**

Service via Clerk's Notice of Electronic Filing upon the following attorneys, who are Filing Users in this case:

      Barry Berke, Esq.

      Frederick Hafetz, Esq.

      Neil Kaplan, Esq.

Dated:      New York, New York
            March 19, 2012

                                     /s/Arlo Devlin-Brown
                                    Arlo Devlin-Brown