UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x
                                        :
UNITED STATES OF AMERICA                :
                                        :
                        v.              :       No. S6 10 Cr. 336 (LAK)
                                        :       ECF Case
CHAD ELIE,                              :
                                        :
                        Defendant.      :
                                        :
————————————————————————x

## SENTENCING MEMORANDUM ON BEHALF OF CHAD ELIE

Barry H. Berke, Esq.
Dani R. James, Esq.
Jade A. Burns, Esq.

KRAMER LEVIN NAFTALIS &
FRANKEL LLP

1177 Avenue of the Americas
New York, New York  10036
(212) 715-9100

*Attorneys for Defendant Chad Elie*

## TABLE OF CONTENTS

**Page**

I.  THE PLEA AGREEMENT AND THE GUIDELINES RANGE ..................................... 1

II. MR. ELIE'S PERSONAL HISTORY AND CHARACTERISTICS WEIGH IN
    FAVOR OF THE LOWEST AVAILABLE SENTENCE WITHIN THE
    GUIDELINES RANGE ......................................................................................... 2

    A.   Mr. Elie Faced Significant Obstacles at Home and School During
           Childhood ███████████████████ ..................................... 2

    B.   Throughout His Life, Mr. Elie Has Been Tremendously Supportive of His
           Family, Friends, Coworkers and Those In Need ..................................... 6

III. THE ABSENCE OF ANY LOSS WARRANTS IMPOSITION OF A LENIENT
    SENTENCE ..................................................................................................... 13

IV. A SENTENCE AT THE LOW END OF THE GUIDELINES RANGE WILL
    AVOID UNWARRANTED SENTENCING DISPARITIES ......................................... 15

V.  MR. ELIE'S POST-INDICTMENT ACTIONS REFLECT HIS COMMITMENT
    TO MAKING AMENDS ...................................................................................... 18

CONCLUSION ...................................................................................................... 20

KL3 2895716.1

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*United States v. Booker*,
    543 U.S. 220 (2005) ................................................................................................2

*United States v. Menendez*,
    600 F.3d 263 (2d Cir. 2010) ................................................................................15

*United States v. Wills*,
    476 F.3d 103 (2d Cir. 2007) ................................................................................15

**STATUTES**

18 U.S.C. § 981(a)(1)(C) ...............................................................................................1

18 U.S.C. § 1306 ..........................................................................................................17

18 U.S.C. § 3553(a) ................................................................................................2, 15

18 U.S.C. § 3553(a)(6) .................................................................................................15

U.S.S.G. § 5B1.1(a)(2) .............................................................................................1, 20

KL3 2895716.1

We respectfully submit this memorandum on behalf of Chad Elie, who is scheduled to be sentenced by this Court on October 3, 2012.  Mr. Elie accepts full responsibility for his offense and its consequences.  Under the plea agreement entered into between Mr. Elie and the government, Mr. Elie's sentencing range is 6 to 12 months under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines").  Consistent with the plea agreement, we respectfully submit that in light of the applicable Guidelines range, Mr. Elie's personal circumstances unrelated to the offense, the absence of any real loss to the banks involved in processing poker, the sentences imposed on other defendants in this and related cases, as well as Mr. Elie's demonstrated commitment to make amends — it would be appropriate to sentence Mr. Elie to a term of probation with a condition of six months of home confinement and a term of community service.

## I.    THE PLEA AGREEMENT AND THE GUIDELINES RANGE

As set forth in the plea agreement, Mr. Elie's Guidelines sentencing offense level is 10 and his criminal history category is I, which yields a Guidelines range of 6 to 12 months. (Def.'s Plea Agreement 3-4.)  Both the government and Mr. Elie have agreed not to seek a sentence outside this Guidelines range.  (Def.'s Plea Agreement 4.)  The Guidelines range of 6 to 12 months is in Zone B of the Sentencing Table, and as a result a probationary sentence may be imposed so long as it includes a condition that substitutes intermittent confinement, community confinement or home detention for at least 6 months.  U.S.S.G. § 5B1.1(a)(2).

Mr. Elie's plea agreement also includes conditions of forfeiture, which Mr. Elie has satisfied.  On May 17, 2012, Mr. Elie forfeited to the United States $500,000 pursuant to 18 U.S.C. § 981(a)(1)(C).  (Def.'s Plea Agreement 2); Ex. 1 (Proof of payment).  Mr. Elie also executed a stipulation, on April 23, 2012, agreeing to forfeit all right title and interest he has in

the assets for which he asserted a claim in *United States v. PokerStars*, 11 Civ. 2564 (LBS)

(S.D.N.Y.).  (Def.'s Plea Agreement 2); Ex. 2 (Stipulation).

## II.   MR. ELIE'S PERSONAL HISTORY AND CHARACTERISTICS WEIGH IN FAVOR OF THE LOWEST AVAILABLE SENTENCE WITHIN THE GUIDELINES RANGE

Pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and 18 U.S.C. §

3553(a), district courts are of course required to impose a sentence that is "sufficient, but not

greater than necessary" to accomplish the traditional goals of sentencing set forth in the statute.

In fashioning an appropriate sentence, courts must consider, among other things, the personal

history and characteristics of the defendant.  18 U.S.C. § 3553(a).  Throughout his life, Mr. Elie

has shown tremendous resolve, overcoming significant emotional obstacles at home ▮

▮ to try to build a productive life for himself.  At every step of the

way, Mr. Elie has also displayed immeasurable compassion and kindness, providing consistent

and extraordinary emotional, unsolicited financial and other support to family, friends,

coworkers and those in need.  We respectfully submit that Mr. Elie's demonstrated resolve,

compassion, and uncommon acts of kindness support sentencing him to a term of probation with

a condition of six months of home confinement and a term of community service.

### A.   Mr. Elie Faced Significant Obstacles at Home and School During Childhood ▮

Mr. Elie was born in Springfield, Massachusetts on March 21, 1980, the son of

Edward Elie and Debbie Colton.  He has an older sister, Beth, who lives in Florida.  At the time

of Mr. Elie's birth, Edward Elie owned a machinery business and Debbie Colton was a medical

assistant.  According to Mr. Elie's family, as described in the attached letters and referenced

below, Mr. Elie was an exceptionally kind, sweet and sensitive child.  Despite facing significant

obstacles at home and school — the two most significant aspects of a child's life — Mr. Elie

maintains these traits as an adult. Indeed, Mr. Elie has become the "kind of person," described by his former employee and friend David Majcher, who is "[a]lways willing to help someone in need." Ex. 3 (David Majcher Letter).

Growing up, Mr. Elie faced a number of obstacles and setbacks in school that limited his educational growth. Mr. Elie's difficulties in school first began in kindergarten. When Mr. Elie was five years old, he was attacked by a Doberman pinscher and almost lost an eye. Ex. 4 (Deborah Colton Letter). As his mother explains in her letter, Mr. Elie received "[hundreds] of sutures that left him both physically and emotionally scarred." *Id.* In the months following the attack, Mr. Elie was so traumatized that he was scared to leave his room or attend school. *Id.* In fact, Mr. Elie was so disturbed that his mother recalls him hiding under his bed the first few weeks after the attack. *Id.* Although Mr. Elie returned to school after receiving counseling, his prolonged absence contributed to his parents' decision to hold him back in school to repeat kindergarten. *Id.*

During elementary school, as Mr. Elie's family members describe in their letters, Mr. Elie's parents went through a "bitter, nasty divorce" that lasted for two years and had a profound impact on Mr. Elie. Ex. 4 (Deborah Colton Letter); Ex. 5 (Darlene Davison Letter); Ex. 6 (Larry Colton Letter). The divorce was particularly difficult for Mr. Elie because his father all but abandoned his children. Ex. 5 (Darlene Davison Letter). Not only did Mr. Elie's father refuse to provide child support, but, as his mother recounts in her letter, he told her and the children that "he would rather see [them] living on the street before he gave [them] any money to live." Ex. 4 (Deborah Colton Letter). As a result of the separation, Mr. Elie's mother was forced to work two jobs as a medical transcriptionist to make ends meet. *Id.* She worked 60-plus hours a week while acting as a single parent to Mr. Elie and his sister. Unfortunately, Mr. Elie and his

sister were forced to take on much more responsibility than children their age should.  As Mr. Elie's mother explains in her letter, she believes that Mr. Elie was particularly impacted by witnessing the extreme emotional and physical stress she experienced during this period, reflecting that "[i]t was at that time in Chad's life that he felt he had to protect me and has been doing so ever since."  *See id.*

Worse than his father's dereliction of his financial responsibilities, was his father's emotional abandonment.  *Id.*  Mr. Elie had a good relationship with his father prior to the divorce, but he had little contact with him after.  *Id.*  Mr. Elie's loss was compounded by the resentment he developed towards his father because of his failure to provide any type of financial support while his mother worked herself to the bone.  *Id.*  In his mother's words, Mr. Elie developed an "emotional detachment" from his father.  *Id.*

According to his family members, the loss of his relationship with his father and the emotional and financial difficulties at home affected Mr. Elie's behavior and performance in elementary school.  *Id.*  Because of these problems, Mr. Elie was held back for a second time, repeating third grade.  (Presentence Report ¶ 78, Aug. 31, 2012 ("PSR").)

Mr. Elie continued to struggle with school through his high school years, and his difficulties were only further compounded by a second extended absence that was precipitated by a car accident.  (PSR ¶ 80.)  At the age of 16, Mr. Elie was involved in a head-on collision that left him with herniated discs in his back and neck and a severed tongue.  (*Id.*)  Mr. Elie was hospitalized for over a week, and the debilitating pain he experienced from his injuries left him unable to return to school for an additional period of time.  (*Id.*)  When Mr. Elie did return to school, he was further behind and continued to be frustrated by his inability to perform at the level of his classmates.  During his senior year of high school, at the age of 19, Mr. Elie was told

- 4 -

that he was too old and would have to withdraw from school and take his GED instead, which he successfully passed.  (*Id.*); Ex. 4 (Deborah Colton Letter).





**B.    Throughout His Life, Mr. Elie Has Been Tremendously Supportive of His Family, Friends, Coworkers and Those In Need**

In ways both large and small, Mr. Elie has consistently provided uncommon

emotional, financial and other support to his family, friends, coworkers and even complete

strangers.  Those who know Mr. Elie describe him as a person whose commitment to helping others is unwavering and deep, whose concern for those in need is substantial and sincere,  and whose impact on the lives of others is personal and meaningful.

No relationship better exemplifies these qualities of Mr. Elie than his relationship with his former employee and friend, David Majcher.  In 2009, Mr. Majcher unexpectedly lost his job in Las Vegas and was without health insurance.  Ex. 3 (David Majcher Letter).  He was struggling to find employment when Mr. Elie offered him a position with his company, Viable Marketing Corporation, in Florida.  *Id*.  As Mr. Majcher recounts in his letter:

> Shortly after I began working at Viable Marketing, I began to experience health problems.  Although I did not know it at the time I was experiencing the early symptoms of Multiple Sclerosis.  I confided in Chad that I was worried about my health and he arranged for me to receive health insurance through his carrier at no cost to me.  Over the following year I went to a variety of health care providers seeking a diagnosis for my symptoms including those who did not accept insurance.  Chad helped me cover all of my medical expenses.

*Id.*

Even after Mr. Majcher stopped working for Viable Marketing and returned to Monterey, California to be near his family, Mr. Elie continued to be a source of support for Mr. Majcher.  *Id.*  Indeed, when doctors finally determined that MS was the cause of his year-long health problems, Mr. Elie was the second person he called with the devastating news.  *Id.*  Upon learning that his friend was suffering from MS, Mr. Elie offered to do whatever he could to help Mr. Majcher.  *Id.*  True to his word, Mr. Elie has done just that.  Mr. Majcher has been undergoing treatment with a medication that controls the symptoms of the disease by helping to prevent permanent nerve damage.  *Id.*  As he explains in his letter:

> Chad has helped me pay for this medication when I cannot afford it.  Without this medication there is a good chance I would be in a wheelchair today.  Even now Chad continues

> to help me pay for my medical expenses.  I don't know
> anyone other than Chad who would have or could have
> done this for me.

*Id.*

Mr. Majcher is not the only friend whom Mr. Elie has helped in a time of crisis. Another example is Mr. Elie's unfailing support of Aaron Rademaker through two life-altering events that led Mr. Rademaker to remark, "I truly feel I owe my life to [Chad]."  Ex. 8 (Aaron Rademaker Letter).

When Mr. Rademaker was 23 years old he went through a divorce that left him homeless. *Id.*  At the time, he and Mr. Elie were coworkers at a marketing agency in Florida and had only known each other for a short period of time.  *Id.*  When Chad learned of Mr. Rademaker's circumstances, he invited Mr. Rademaker to stay with him until he was able to get back on his feet.  *Id.*  Not only did Mr. Elie invite Mr. Rademaker into his home, but he also invited Mr. Rademaker's two young children.  *Id.*  Mr. Rademaker explains that Chad helped with his daughters and became "Uncle Chad" to them.  *Id.* According to Mr. Rademaker, "[w]ithout his help I would not have been able to see my children or have a place for us to sleep."  *Id.*

Tragically, when Mr. Rademaker was 25 years old and living in Florida, he was the victim of a brutal attack that left him physically disabled and emotionally scarred.  *Id.*  One night while Mr. Rademaker was sleeping, an intruder entered his home in search of items to steal.  *Id.*  When he encountered Mr. Rademaker, the intruder struck him in the head with the butt of a shotgun and then shot him at point blank range.  *Id.*  Mr. Rademaker's injuries were so severe that he was put into a medically induced coma for three days, so that surgeons could reconstruct his femur bone and conduct a femoral arterial graft and a lower fasciotomy.  *Id.*  The

assault caused nerve damage and loss of mobility in his left leg, leaving Mr. Rademaker in extreme pain and barely able to walk. *Id.*

To make matters worse, Mr. Rademaker had no family living in Florida at the time of the assault. *Id.* Mr. Elie, however, came to his aid and provided the support Mr. Rademaker needed. *Id.* As Mr. Rademaker explains in his letter, Mr. Elie "sat by my side in the hospital when I was in the coma. When Chad had to leave for work he actually paid a mutual friend to not go to work and sit with me so that someone would be there for me when I woke up." *Id.* Mr. Elie also made sure all of Mr. Rademaker's bills were paid while he was in the hospital and even sent child support on a weekly basis to his children. *Id.*

Throughout Mr. Rademaker's long and difficult recovery, Mr. Elie continued to provide invaluable support. Mr. Elie bought Mr. Rademaker a plane ticket to Kentucky so that he could live with his mother while he recuperated. *Id.* Those first few months in Kentucky were extremely difficult for Mr. Rademaker. He explains,

> I felt so helpless and in so much pain I contemplated suicide on a regular basis. Chad stayed in contact with me and helped pay for my physical therapy, doctors' appointments and any medication that I needed while I was in Kentucky.

*Id.* Once Mr. Rademaker improved, Mr. Elie offered him a job that he had specifically created to accommodate Mr. Rademaker's physical condition and helped him move back to Florida into an apartment that Mr. Elie had furnished for him. *Id.* Mr. Elie also provided Mr. Rademaker with an advance on his salary to help Mr. Rademaker "get back on [his] feet." *Id.* In addition, he paid for Mr. Rademaker to go to a pain management specialist in Florida and still tries to help Mr. Rademaker whenever he can. *Id.*

Even as a teenager, Mr. Elie displayed a remarkable capacity to provide emotional support to those in crisis like Mr. Majcher and Mr. Rademaker. When Mr. Elie was growing up,

- 9 -

his mother experienced severe anxiety attacks.  Ex. 4 (Deborah Colton Letter); Ex. 5 (Darlene

Davison Letter).  As his mother describes in her letter, during this "most difficult time," Mr. Elie

would sit up with her most nights until the early hours of the morning.  Ex. 4 (Deborah Colton

Letter).  While "[m]any people feel that if you can't see the physical pain it doesn't exist," her

sensitive son knew otherwise.  *Id.*  Mr. Elie provided his mother with emotional support and

comfort even though he was at an age when many boys are not so giving to their parents, and

"was very instrumental in getting [her] through this most difficult time."  *Id.*

Mr. Elie's family and friends know that he will do whatever he can to help them

no matter how daunting the problem.  In 2010, Mr. Elie's stepfather, Larry Colton, lost his job.

Ex. 6 (Larry Colton Letter).  With only one income, Mr. Elie's mother and her husband could no

longer afford the mortgage payment on the house they had lived in for 16 years.  *Id.*  As soon as

Mr. Elie found out about their predicament, he offered to buy the house for them so that they

would not have to leave their home.  *Id.*

Mr. Elie also understands the importance of giving back to the community at

large, something he learned from his grandmother, a former marine.  Ex. 5 (Darlene Davison

Letter).  As a veteran, Mr. Elie's grandmother dedicated much of her time to the U.S. Marine

Corp. Reserve Toys for Tots Foundation, whose mission is to collect and distribute toys as

Christmas gifts to needy children.  *Id.*  Every year she organized a toy drive in Florida.  *Id.*  After

moving to Florida when he was 15 years old, Mr. Elie assisted his grandmother with the toy

drives every year for over a decade.  *Id.*  It was there that Mr. Elie developed an appreciation for

and a commitment to volunteering to serve those in need.

Mr. Elie has carried on this tradition of volunteering as a family with his wife,

Destiny Davis.  Ms. Davis's family has a long tradition of  foregoing the exchange of gifts

- 10 -

during the holiday season and instead using the money they would have spent on one another to buy gifts and necessities for the less fortunate, especially families with children.  Ex. 9 (Destiny Davis Letter).  After meeting Ms. Davis, Mr. Elie enthusiastically adopted this tradition as well and now provides organizations including the Shade Tree, a local shelter for homeless and abused women and children, and the Salvation Army with items from their "necessity lists" every holiday season.  *Id.*

As these examples show, Mr. Elie's is someone who feels great compassion for the vulnerable and less fortunate.  His stepfather, Larry Colton, explains:

> Chad wears his heart on his sleeve. . . . He not only feels for those less fortunate, but he takes action to help — something most people do not do.  While most of us watch the TV ads for less fortunate children and abused animals and do nothing, Mr. Elie actually picks up the phone and makes donations.  He has a huge heart and expects nothing in return.  He would rather remain in the shadows than accept any accolades for his actions.

Ex. 6 (Larry Colton Letter).  Father Dave Casaleggio, the Administrator of St. Anne Roman Catholic Church, similarly lauds Mr. Elie for being "very generous" and "helpful" to the parish in a "variety of ways."  Ex. 10 (Fr. Dave Casaleggio Letter).  Father Casaleggio recounts one example when, recognizing the parish's need for assistance, Mr. Elie donated a car to the church that the parish was able to sell at auction for a substantial sum.  *Id.*  Mr. Elie's mother similarly writes in her letter of the time when Mr. Elie met a man named John behind his office building looking for food in a dumpster and offered him a job to help him get back on his feet.  Ex. 4 (Deborah Colton Letter).  Although Mr. Elie's offer ultimately did not fix John's problems, Mr. Elie still wanted to do what he could to try and help.  *Id.*

Mr. Elie's aunt, Darlene Davison, tells of yet another time Mr. Elie was moved to action when he could have easily not gotten involved.  In 2004, Hurricane Charley hit

- 11 -

southwestern Florida causing major damage and destruction.  Ex. 5 (Darlene Davison Letter).

Mr. Elie and his aunt became aware that many animals in Arcadia, Florida were suffering as a

result of the hurricane and there were insufficient resources to devote to animal rescue.  *Id.*

Together, they organized a group of 15 people to travel to Arcadia to rescue as many abandoned

and lost pets as possible and bring them to animal shelters.  *Id.*  The circumstances they

encountered were "gut-wrenching," and Mr. Elie was visibly upset but "worked as hard as he

could to bring as many animals to safety as possible."  *Id.*  Ms. Davison writes that she will never

forget the sight of Mr. Elie carrying an injured and starving German shepherd in his arms with

tears streaming down his face.  *Id.*

Mr. Elie is the type of person who not only helps others in times of great need, but

also helps those around him with the small things of everyday life that are often overlooked.  As

Mr. Elie's mother-in-law, Kelly Green, writes in her letter, Mr. Elie has always reached out to

help her even before she officially became his mother-in-law.  Mr. Elie began dating his wife

around the time that Ms. Green's youngest son, Dallas, was learning how to drive.  Ex. 11 (Kelly

Green Letter).  As a single parent, it had fallen on her to teach her children this skill.  *Id.*  Ms.

Green had previously taught her two oldest children to drive, and she found the experience to be

"stressful and terrifying."  *Id.*  She dreaded the thought of repeating it with her son.  Sensing her

distress, Mr. Elie offered to help teach her son how to drive.  *Id.*  Ms. Green recounts how Mr.

Elie, showing great patience, taught Dallas to drive on the busy freeways and streets of southern

California.  *Id.*

Mr. Elie's aunt, Darlene Davison, observes in her letter that Mr. Elie is "always

searching for ways to help those around him without being asked."  Ex. 5 (Darlene Davison

Letter).  She attributes this, in part, to his ability to see and understand things from another

person's perspective.  *Id.*  Ms. Davison recounts one small but illustrative story that captures this ability:

> Near the end of my Mother's life, she became home bound as she was dying of emphysema.  During one of Chad's frequent visits, he noticed that my mother could no longer get up from her chair to operate her DVD player. Something no one else in the family had realized and my Mother did not mention.  Without a word to anyone Chad showed up the next day with a portable DVD player and a selection of her favorite movies.  She was so happy, and the movies provided great comfort and joy in her last days.

*Id.*

We respectfully submit that Mr. Elie's uncommon acts of kindness and commitment to family, friends, coworkers and his community, as well as the resiliency he has shown and inspired in others, all counsel in favor of a lenient sentence.

## III.   THE ABSENCE OF ANY LOSS WARRANTS IMPOSITION OF A LENIENT SENTENCE

Mr. Elie fully accepts responsibility for his actions and the wrongfulness of his conduct.  Without in any way seeking to excuse or justify his conduct, we respectfully submit that the fact that there was no real loss intended to the banks that were misled into processing poker transactions and that any actual loss was *de minimis* warrants a sentence at the low end of the Guidelines range.

The poker transactions that Mr. Elie helped to process were real commercial transactions with real customers, similar in most respects to other types of e-commerce transactions.  When a player deposited money into his online poker account, he would provide his banking and payment information to the poker company.  The poker company would transfer the player debit information to one of Mr. Elie's companies.  Mr. Elie's company would then prepare the payment information and deliver it to the bank at which Mr. Elie maintained a merchant account.  Through either the Automated Clearing House System or the Check 21

- 13 -

System, that information would then be transferred to the player's bank, and the player's account would be debited for the amount of the deposit.

As the government has acknowledged, "gambling operations" like the poker companies are "unlikely to cause large financial losses to banks," (Gov't Sentencing Mem. as to Brent Beckley at 4, July 3, 2012) and Mr. Elie did not expect or intend to expose the banks to even a risk of loss by processing these transactions, because banks protect themselves from the risks associated with payment processing for internet transactions — whether for poker, payday loans or purchases on Amazon.com — through the use of cash reserves and fees. As a merchant, Mr. Elie was required to maintain a cash reserve at the banks processing payments for Viable Marketing. If a customer, in this case a poker player, had insufficient funds to cover a transaction at the time of settlement, the bank could draw upon Viable's cash reserves to cover the transaction. In the unlikely event a poker player disputed a charge after settlement, the bank could assess a charge-back fee against the same reserve to cover the expenses associated with the disputed transaction.

As part of his plea agreement, Mr. Elie stipulated that there was a reasonably foreseeable loss to the banks between $5,000 and $10,000, based on the government's assertion that it may have cost the banks a small but unquantifiable amount of money to open and close the merchant accounts Mr. Elie used to process poker transactions. (*See* Def.'s Plea Agreement 3.) It is our understanding, however, that no losses have been identified by any of the banks that were misled into processing poker transactions. (*See, e.g.,* PSR ¶ 54). Under these circumstances, we respectfully submit that the two point increase in Mr. Elie's stipulated Guidelines offense level more than adequately reflects the seriousness of the fraud offense, and the absence of any verifiable loss counsels in favor of a lenient Guidelines sentence.

## IV.     A SENTENCE AT THE LOW END OF THE GUIDELINES RANGE WILL AVOID UNWARRANTED SENTENCING DISPARITIES

In imposing a sentence, courts should consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6); *see also United States v. Menendez,* 600 F.3d 263, 269 (2d Cir. 2010) (opining that a "district court may compare codefendants' sentences to avoid unwarranted sentencing disparities"); *United States v. Wills,* 476 F.3d 103, 109 (2d Cir. 2007) (noting that § 3553(a) was intended to eliminate national disparity in sentences).  To date, there have been a number of individuals sentenced for their roles in processing payments for the internet poker companies — including by this Court.  The sentences of these individuals strongly support a sentence at the low end of the Guidelines range for Mr. Elie.

**Andrew Thornhill** – Andrew Thornhill was a payment processor who was involved in nearly all of the same processing channels as Mr. Elie.  He worked with Mr. Elie to establish the processing account at Fifth Third Bank, and he played a key role in establishing processing at SunFirst Bank, where he not only served as a liaison between the poker companies and the bank, but also worked directly with bank employees and board members, including John Campos, to get the poker processing operation up and running.  *See, e.g.,* Ex. 12 (native file from Gov't DVD 4) (email chain reflecting Thornhill's extensive involvement at SunFirst).

Mr. Thornhill was also involved in processing channels that had nothing whatsoever to do with Mr. Elie.  For example, in the summer of 2009, Mr. Thornhill worked with Bradley Franzen to process electronic checks for poker companies disguised as payments to "Green2YourGreen," a wholly fictitious company that purported to sell environmentally friendly household products.

Mr. Thornhill pled guilty to one count of conspiracy to operate an illegal gambling business and to make false statements in connection with bank applications.  Tr. of Sentencing at 3, *United States v. Thornhill,* 10 Cr. 533 (AKH) (S.D.N.Y. Oct. 21, 2010).  While the government and Mr. Thornhill stipulated to a Guidelines range of 6 to 12 months, Judge Hellerstein sentenced Mr. Thornhill to 3 months' imprisonment. *Id.* at 27.

**Douglas Rennick** – From in or about 2007 until June 2009, Douglas Rennick provided payment processing services for poker and other gaming transactions in the United States.  Superseding Information ¶ 1, *United States v. Rennick*, 09 Cr. 752 (SHS) (S.D.N.Y. May 11, 2010).  According to the government, Mr. Rennick opened up a number of bank accounts in the name of several companies he controlled.  Gov't Sentencing Mem. at 2-3, *United States v. Rennick*, 09 Cr. 752 (SHS) (S.D.N.Y. Sept. 14, 2010).  Mr. Rennick did not disclose to the banks that the accounts would be used to process gaming transactions, and in some instances, he misrepresented what the accounts would be used for.  *Id.*  While we do not know the precise number of processing channels that Mr. Rennick was involved in establishing, it appears that Mr. Rennick was involved in processing $350 million of transactions.  Superseding Information ¶ 1, *United States v. Rennick*, 09 Cr. 752 (SHS) (S.D.N.Y. May 11, 2010).

Like Mr. Elie, Mr. Rennick pled guilty to a single-count information with a stipulated Guidelines sentencing range of 6 to 12 months and forfeiture of $500,000 of his own money.  Judge Stein sentenced Mr. Rennick to six months' probation with the condition of home confinement.  Tr. of Sentencing at 31-35, *United States v. Rennick*, 09 Cr. 752 (SHS) (S.D.N.Y. Sept. 15, 2010).

**Curtis Pope** – From February 2008 through May 2009, Curtis Pope developed and controlled the vast majority of Intabill's poker processing in the United States, earning

approximately $10 million for his efforts. Tr. of Sentencing at 11, *United States v. Pope,* 10 Cr. 675 (RJH) (S.D.N.Y. June 28, 2011). In light of the significant and prolonged role he played in Intabill's processing, Mr. Pope pled guilty to a three-count information charging bank fraud, gambling and money laundering conspiracies, with a stipulated Offense level of 14. *See* Judgment, *United States v. Pope,* 10 Cr. 675 (RJH) (S.D.N.Y. Aug. 9, 2011). Because of his prior criminal conduct, Mr. Pope had a criminal history category of III, resulting in a Guidelines range of 21 to 27 months. Tr. of Sentencing at 15, *United States v. Pope,* 10 Cr. 675 (RJH) (S.D.N.Y. June 28, 2011). Judge Holwell imposed a sentence at the lowest end of that Guidelines range. *Id.* Had Mr. Pope been in criminal history category I, the lowest end of that Guidelines range would have been 15 months' imprisonment.

**John Campos** – As measured by time and transaction volume, the majority of Mr. Elie's involvement in poker processing occurred at SunFirst Bank, where Mr. Campos served as a consultant and Vice Chairman of the Board of Directors. As this Court is aware, Mr. Campos pled guilty to one count of violating 18 U.S.C. § 1306, a misdemeanor, for his role in the poker processing at SunFirst and was sentenced to three month's imprisonment. (J. July 3, 2012.)

**Brent Beckley** – Mr. Beckley served as the head of payment processing for Absolute Poker from 2004 through April 2011. (Gov't Sentencing Mem. as to Brent Beckley at 2-3, July 3, 2012.) In that position, Mr. Beckley contracted "with third parties around the world" to set up credit card and electronic check payment channels, primarily through the use of "dummy corporations." (*Id.* at 3.) As described by the government, Mr. Beckley played a vital role in the success of Absolute Poker, a "large-scale" and "long-running" gambling operation, by helping Absolute Poker "obtain the deceptive processing 'solutions' so fundamental to its

- 17 -

operation." (*Id.* at 6.)  The Court sentenced Mr. Beckley to 14 months' imprisonment, a sentence

at the lower end of his 12 to 18 months Guidelines range.[1]  (J. July 27, 2012.)

## V.    MR. ELIE'S POST-INDICTMENT ACTIONS REFLECT HIS COMMITMENT TO MAKING AMENDS

Not only has Mr. Elie taken full responsibility for his conduct by timely pleading

guilty before the Court, but he also has taken a number of actions post-indictment that

demonstrate his commitment to making amends and turning his life around.

In June 2011, the United States Attorney's Office in the District of Utah indicted

a man named Jeremy Johnson for his role in the allegedly fraudulent activities of his company,

IWorks.  *See* Indictment, *United States v. Johnson* 11 Cr 501 (PMW) (D. Utah June 15, 2011).

Shortly after that indictment was filed, the Assistant United States Attorney handling the case

reached out to Mr. Elie seeking his assistance at Mr. Johnson's detention hearing.  Mr. Elie had

worked with Mr. Johnson, among others, to establish processing at SunFirst.  As a result of that

experience, Mr. Elie had gained a wealth of information about the size and whereabouts of Mr.

Johnson's assets, which the government believed Mr. Johnson would use to flee were he released

on bail.  Even though Mr. Elie was already under indictment in this case, he agreed to testify at

Mr. Johnson's detention hearing.  Mr. Elie spent two days preparing for the detention hearing,

one with the AUSA and one with his personal attorney, and he covered the expenses he and his

lawyer incurred in traveling to Utah for the hearing.

Mr. Elie also provided assistance to the government in connection with the

Federal Trade Commission's related civil suit against Mr. Johnson and other individuals and

---

[1] A review of the sentences imposed in this and similar cases reveals that Ira Rubin is the only payment processor to receive a sentence above the applicable Guidelines range.  Unlike the other payment processors who have been sentenced, Mr. Rubin had 15 prior criminal convictions, was previously incarcerated on four separate occasions and, when the indictment in this case was unsealed, fled the country and sought to move most of his assets beyond the reach of the government.

entities affiliated with IWorks.  *See* Complaint, *FTC v. Johnson,* 10 CV 2203 (D. Nev. Dec. 21, 2010).  Over the course of two days, Mr. Elie met with the court-appointed receiver to provide information that might assist the receiver in recovering assets belonging to Mr. Johnson and others affiliated with IWorks.  We also understand from Mr. Elie's personal attorney that Mr. Elie directed him to voluntarily provide the FTC with certain of Mr. Elie's documents that Mr. Elie believed might be helpful to the agency's case.

Mr. Elie took these steps without seeking any benefit for himself and despite knowing that his testimony and the information he provided could be used against him in this case and by the receiver in making claims against his assets.  He cooperated with the government without any hope or expectation of receiving their assistance in return or any other benefit, and despite the risks to himself and his assets.  Mr. Elie did so because he wanted to use the experience and knowledge he gained from his poker processing and other activities to start making amends for his prior conduct.

These actions by Mr. Elie are consistent with the observations of Paul Masto, a 25-year veteran of the United States Secret Service.  Mr. Masto writes in his letter that Mr. Elie "has taken responsibility for his wrongdoing, he has made amends and he has a strong desire to learn from his mistake and to never do anything again in the future to cause such harm to his family by violating any law."  Ex. 13 (Paul Masto Letter).  Mr. Masto concludes with a personal observation about Mr. Elie that his counsel would wholeheartedly echo:

> I hope that my brief correspondence to you will in some way assist you in viewing Chad as the kind and warm hearted young man I know him to be who has made serious mistakes but who has a strong resolve never to repeat them again.

*Id.*

**CONCLUSION**

For all of the reasons set forth above, we respectfully urge the Court to impose a sentence at the bottom of the Guidelines range of 6 to 12 months, and specifically request a probationary sentence with a condition of six months home detention and community service, as permitted under this Zone B Guidelines range.  U.S.S.G. § 5B1.1(a)(2).

Dated:  September 19, 2012
New York, New York

Respectfully submitted,

KRAMER LEVIN NAFTALIS & FRANKEL LLP


By:  /s/ Barry H. Berke
Barry H. Berke, Esq.
Dani R. James, Esq.
Jade A. Burns, Esq.
1177 Avenue of the Americas
New York, New York  10036
(212) 715-9100 (Telephone)
(212) 715-8000 (Fax)

*Attorneys for Defendant Chad Elie*