UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| United States<br><br>v.<br><br>Chad Elie | S6 10 Cr. 336 |

### Government's Memorandum of Law

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Arlo Devlin-Brown
Andrew Goldstein
Assistant United States Attorneys
    *Of Counsel*



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

<span style="font-style:italic">Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007</span>

September 26, 2012

**By Hand & ECF**
Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re: <u>United States v. Chad Elie</u>, S6 10 Cr. 336

Dear Judge Kaplan:

  The Government writes with respect to the sentencing of Chad Elie (the "defendant"), and to address the defendant's sentencing submission dated September 19, 2012. The parties stipulated pursuant to a plea agreement to Guidelines calculations (agreed to by the Probation Department) resulting in an applicable sentencing range of 6-12 months' imprisonment, and further agreed that neither party would seek a sentence outside the stipulated Guidelines range. The Government's position is that the Court should sentence the defendant to a sentence within this range that is significant enough to address the seriousness of Elie's conduct and to deter the defendant from engaging in other illegal activity in the future.

**The Offense Conduct**

  Following the passage of the Unlawful Internet Gambling Enforcement Act ("UIGEA") in 2006, Pokerstars, Full Tilt Poker and Absolute Poker (the "Poker Companies") turned initially to Australia-based Intabill as their primary payment processor for electronic checks. Intabill, operated Daniel Tzvetkoff (charged in the original indictment, 10 Cr. 336) processed well over $1 billion in transactions for the Poker Companies for customers throughout the United States before it collapsed in March 2009.

  Intabill, being based in Australia, needed United States partners to open bank accounts in the names of scores of phony companies to handle the volume of poker transactions, and it was always looking for new shell companies and new banks to replace processing arrangements that were regularly detected and shut down. Intabill relied in part on Curtis Pope, a processor of internet-issued "payday loans," to process and disguise these gambling transactions. And it was

1

through Curtis Pope that Chad Elie was first introduced to internet gambling payment processing.

In the early Spring of 2008, Elie was working with Curtis Pope, who was based in Las Vegas, to cross-market various internet products and services to individuals who applied over the internet for payday loans. Elie had substantial experience in the internet marketing industry. It began with businesses Elie created that would "spam" e-mail users with advertisements for products such as male "enhancement" pills. Then, after authorities and e-mail service providers began cracking down on spammers, Elie shifted to selling internet users memberships in various "clubs" that promised valuable services (shopping discounts, identity theft protection, etc.) in return for automatic and recurring monthly fees. Elie gained experience in the payment processing industry because it was difficult to find banks which would accept these "high risk" transactions. Pope was himself searching for new "channels" to handle the tremendous volume of gambling transactions Intabill was seeking to process, and Elie and his banking connections seemed promising.

In April 2008, Elie met Intabill's founder Daniel Tzvetkoff in Las Vegas for the first time, and the two discussed whether Elie's payment processing connections could be used to process payments for internet poker. Following that meeting, Elie worked hard to come up with ways to process the poker transactions for Intabill, including developing an idea (which did not ultimately get off the ground) of using a multi-level marketing program relating to the purchase and sale of internet advertisements as a cover for payments to and from online gamblers.

Although Elie repeatedly told Tzvetkoff and others that he had numerous processing solutions in the works, he ultimately created only one successful gambling processing solution for Intabill. Elie and a colleague from the internet marketing industry – Jeremy Johnson – created a processing account through the National Bank of California in the name of Viable Processing Solutions, with the actual processing to be handled by a division of Intuit. In the account application, Elie claimed that the processing would be for the repayment of payday loans while knowing it would in fact be used to process poker transactions.

Intabill used the Viable Processing Solutions account to process millions of dollars in transactions for Pokerstars before Intuit and the National Bank of California learned they had been misled and refused to continue processing. Although the money in the account was for Intabill (and ultimately Pokerstars), Elie transferred over $4,000,000 from the account to his own bank accounts (purportedly because he believed that his partners had cheated him out of his fair share of processing fees in other businesses), refusing to return the money even following personal entreaties by the head of Pokerstars (co-defendant Isai Scheinberg). Pokerstars sued Elie (though of course not in its own name). After Elie filed a motion to dismiss that raised the issue of revealing the "real" plaintiff, the two sides ultimately came to an agreement through which Elie would return some of the money and find more banks to handle Pokerstars transactions.

2

The temporarily strained relationship with Pokerstars did not inhibit Elie from continuing to process gambling transactions, however. In the summer of 2009 Elie processed millions of dollars of transactions for all three Poker Companies through his company Viable Marketing Corporation via an account Elie had opened at Fifth Third Bank to process for what he told his banker were payments for his online clubs. Elie did not tell the bank he would be processing internet gambling transactions, and when the bank halted the processing, alarmed by the high volume of returned transactions, Elie falsely denied that the transactions related to internet gambling, including in an e-mail to his banker.

On or about October 26, 2009, the Government obtained warrants from a United States Magistrate Judge for the seizure of approximately $8.6 million in bank accounts controlled by Elie at Fifth Third Bank and Bank of America. On that same day, Elie spoke briefly to two FBI agents, who informed Elie that the funds were seized because they related to the processing of illegal gambling transactions. Elie stated that he would travel to New York the following week to meet with the FBI agents and discuss the matter, but did not do so. Instead, Elie continued with negotiations already underway with defendant Campos whereby Elie and Elie's partner, Jeremy Johnson, would purchase a substantial share of Sunfirst Bank ("Sunfirst") in Saint George, Utah, in return for Sunfirst processing transactions for the Poker Companies.[2] Following the seizures of the Viable Marketing account at Fifth Third Bank, however, Elie stepped back to serve as a silent partner in the new venture, instructing Sunfirst to keep his name off the account and arranging (after discussing the matter with a representative of Full Tilt Poker) for Jeremy Johnson to hold the stock in the bank on Elie's behalf.[1] Elie remained undeterred in moving forward even after another partner in the Sunfirst venture, Andrew Thornhill, was forced to abandon the Sunfirst project after being arrested on December 16, 2009 arrest based on a warrant from the Southern District of New York relating to processing payments for the Poker Companies. *See United States v. Andrew Thornhill*, 10 Cr. 533 (S.D.N.Y) (AKH). Several other arrests in late 2009 and early 2010 of former associates of Elie, including Curtis Pope and Daniel Tzvetkoff, likewise had no impact on Elie's continued willingness to process gambling transactions.

---

[1] This arrangement turned out as might have been expected: Johnson apparently kept most of the profit from the Sunfirst processing, causing Elie to file a lawsuit against him. When Johnson was subsequently indicted in the District of Utah for using Sunfirst processing for internet marketing fraud schemes, Elie did, as the defense points out in its submission, voluntarily (and without any agreement whatsoever with the Government) testify in a bail proceeding about his knowledge of Johnson's techniques for hiding criminal assets (for example, Elie testified that Johnson recommended keeping assets in gold to hide them from the Government and that Elie had subsequent to this advice purchased gold bars from Johnson). *See United States* v. *Johnson*, 11 Cr. 501 (D. Utah).

The poker processing at Sunfirst lasted until early November 2010 when, following an examination, the FDIC issued a consent order directing Sunfirst to cease all processing in the accounts used to process transactions for the Poker Companies as well as third party payment processing generally, which resulted in the Poker Companies losing access to both millions of dollars held by Sunfirst Bank (the accounts were effectively frozen per the FDIC order) and in need of a new payment processing channel.  Elie then helped the Poker Companies find replacements for Sunfirst.  In November 2010, Elie contacted Full Tilt Poker's Director of Payments, co-defendant Nelson Burtnick, and told Burtnick that he "treated [] 2 banks like I did with SF [Sunfirst]."  In fact, as with Sunfirst, Elie identified two small banks under FDIC scrutiny for low capital – New City Bank and All American Bank  – and promised investment in return for processing transactions for the poker companies.  The FDIC shut down these new banking arrangements shortly after they started.  Even so, Elie persisted, e-mailing the Director of Payments for Full Tilt Poker in the weeks before Elie was arrested about small financially troubled credit unions that might be willing to process poker transactions in similar arrangements.

## II.     Sentencing Considerations

The parties agree with the Probation Department on the applicable guidelines calculations.  The offense level for illegal gambling is 12 (U.S.S.G. § 2E3.1), and the Guidelines provide for no adjustments based on the size or scope of the gambling operation at issue. The existence of a bank/wire fraud charge, grouped with the gambling offense, similarly has no impact on the Guidelines given the minimal estimated losses stemming from Elie's conduct.[2]

---

[2]     The e-check processing that Elie offered to the Poker Companies was not riskless to banks – under the rules governing such transactions, customers could (and in the case of internet poker regularly did) reverse the electronic withdrawals from their checking accounts, thus exposing the bank Elie had arranged to handle the transactions to direct financial risk.  However, banks, recognizing the risks associated with all merchant processing (particularly internet merchant processing) require payment processors to post reserves that will in most cases be sufficient to absorb any such direct financial losses.

Accordingly, with a two level reduction for acceptance of responsibility, the applicable Guidelines range is 6 to 12 months' imprisonment. Given the fixed 12 levels set by the gambling guideline (meaning 12 also becomes the base offense level for money laundering), and the limited impact of the fraud guideline, the sentencing ranges for co-defendants in this and related cases fall within a fairly narrow band, with criminal history and role adjustments responsible for most of the difference between them.

With regard to the Section 3553(a) factors, the size and scope of the gambling operations at issue, and the sophisticated techniques through which they processed illegal payments (the disguising of transactions, the offers to "invest" in failing banks), speak to the "seriousness of the offense," the need "to promote respect for the law, and to provide just punishment for the offense." This consideration applies to Elie just as it does to his co-defendants. Indeed, Elie was involved in gambling processing – through a variety of banks, with a variety of partners, and using a variety of processing strategies – from mid-2008 until close to the time of his April 2011 arrest.

A further offense-related consideration – more particular to Elie, and the need to deter him specifically – is Elie's continued willingness to handle the gambling processing transactions despite his awareness that his partners were being arrested for their roles and that the FBI had obtained a seizure warrant for some of Elie's processing accounts. This did not deter Elie from continuing to set up new processing relationships, though he did take, at least with respect to Sunfirst, some steps to remove himself from the paper trail and limit attention to himself. Indeed, Elie engaged in this continued processing despite having hired, following the October 2009 seizures, his prior counsel, William Cowden, to engage with the Department of Justice and attempt to resolve the FBI seizure and, undoubtedly, avoid his client's indictment if possible. While the Government is not privy to the legal advice that Mr. Cowden, a former DOJ attorney, may have conveyed to Elie, it is difficult to imagine that his attorney – whatever the legal analysis of the Government's potential case – would have encouraged his client to continue with a course of conduct that had already led to the seizure of Elie's assets and the arrests of some of his partners.

The defense memo implicitly addresses this point by arguing that the defendant has a difficult time cognitively in terms of his ability to process new information inconsistent with his existing mindset. And while there may be merit to this analysis, that that this may have been a cause of Elie's failure to recognize various "red flags" does not address the concern that something similar could occur again if Elie, in his next career, similarly ignores repeated signs that his conduct may be illegal. Moreover, there is evidence that, in addition to any information processing issues, Elie simply did not particularly care if his conduct was lawful. Most revealing in this regard are a series of Skype "chats" that Elie engaged in with sometimes processing partner Andrew Thornhill that were recovered from Thornhill's computer following his arrest (and produced to the defense in this case). In the chats, Elie makes repeated comments evincing a disregard for the rules of the financial system, and a desire, as if it were a game, to evade these rules. For example, in one chat with Thornhill in May 2008, Thornhill asks Elie whether he can help Tzvektoff's Intabill issue $15 million in ACH credits (i.e. payments for gamblers

5

withdrawing money). Elie responds "I don't know how much traffic or data he has but I can handle the riskiest shit. And I can make everyone a SHIT ton of money."[3] In another example, in an October 2008 chat with Thornhill relating to processing solutions, Elie commented that "nacha [the entity that administers the Automated Clearinghouse electronic payments systems] is hot for the trot / they are on a mission to get people out of the system like myself." Elie's own actions – the disguised processing, the lies to banks, and the willingness to exploit small banks in desperate need of funds – evince a cynical and mercenary view of financial rules created so that authorities can monitor and block the use of the financial system to fund illegal enterprises.

These are not, of course, the only relevant sentencing considerations. But just as the defense's extensive submission on Elie's acts of personal kindness and difficult family background are part of the picture, so too is the fact that Elie was undeterred from halting gambling processing even after it became clear that it could lead to his arrest and was unwilling to accept responsibility for his conduct until shortly before trial was to commence.

In conclusion, the Government respectfully requests that the Court sentence Elie within the Guidelines range that reflects both the positive attributes relating to the defendant's background and character as well as factors relating to the seriousness of the offense nad the particulars of Elie's role in it.

        Respectfully submitted,

        PREET BHARARA
        United States Attorney


By:    /s/ Arlo Devlin-Brown
        Arlo Devlin-Brown
        Andrew Goldstein
        Assistant United States Attorneys

---

[3] Given the posture of the case, the Government references only these two examples. Should the defense dispute the accuracy of these interpretations or Elie's attitude with regards to compliance with financial rules more broadly –an issue that counsel will discuss in advance of sentencing – the Government will provide a full set of relevant chat transcripts so the Court can better resolve any such dispute.